UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

LORINDA IRENE SWAIN,

                Petitioner,                    Case No. 1:05-cv-438

v.                                       Honorable Paul L. Maloney

ROSETTUS WEEKS,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  After a jury trial, Petitioner was convicted in the Calhoun County Circuit Court of four counts of first-degree criminal sexual conduct (CSC) with a person under the age of thirteen, MICH. COMP. LAWS § 750.520b(1)(a).  On October 14, 2002, the Calhoun County Circuit Court sentenced Petitioner to four concurrent prison terms of twenty-five to fifty years.  In her *pro se* amended petition (docket #6), Petitioner raises the following four grounds for habeas corpus relief:

    I.      INEFFECTIVE ASSISTANCE OF COUNSEL. (1) FAILURE TO FILE TIMELY WITNESS LIST, (2) FAILURE TO CALL [PETITIONER'S] EXPERT WITNESS AT TRIAL, (3) ALLOWED PREJUDICIAL EVIDENCE TO BE ADMITTED AGAINST [PETITIONER], AND (4) FAIL[URE] TO PROPERLY PREPARE FOR TRIAL.

    II.     TRIAL COURT FAILED TO GRANT A NEW TRIAL BASED ON THE RECANTATION OF COMPLAINANT.

    III.   NEWLY DISCOVERED EVIDENCE (PERJURED TESTIMONY). COMPLAINANT SUBSEQUENTLY ADMITTED TO DR. STEPHEN MILLER AND PASSED A POLYGRAPH EXAMINATION THAT HIS TESTIMONY WAS PERJURED.

IV.   NEWLY DISCOVERED EVIDENCE (BIAS & PREJUDICE OF
WITNESS).  [PETITIONER] SUBSEQUENTLY DISCOVERED AFTER
[HER] TRIAL THAT [A] WITNESS HA[D] A HISTORY OF
CONTACTING VARIOUS PROSECUTOR OFFICES FOR FAVORABLE
TREATMENT [AND] MAKING UP STORIES OF [PETITIONER'S]
ADMITTING TO HER THAT THEY HAD CONFESSED.

(Am. Pet. at 6-7, 9-10; docket #6.)

Respondent filed an answer to the amended petition (docket #18) stating that the

grounds should be denied because they are either procedurally defaulted or noncognizable state law

claims that have no merit.  Petitioner filed a reply (docket #43).  Upon review and applying the

Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA)

standards, I find that Petitioner's grounds for habeas relief are procedurally defaulted and are

without merit.  Accordingly, I recommend that the amended petition be denied.

**<u>Procedural History</u>**

A.   **Trial Court Proceedings**

The state prosecution arose from Petitioner's alleged sexual contact with her adopted

minor son, Ronald B. Swain (Ronny), between January 1993 and December 1996 in Calhoun

County.  The disputed acts involved Petitioner performing oral sex on Ronny.  Petitioner was

charged with four counts of first-degree criminal sexual conduct (CSC I) with a person under

thirteen years old, MICH. COMP. LAWS § 750.520b(1)(a).  Petitioner was tried before a jury

beginning August 12, 2002, and concluding on August 20, 2002.[1]

---

[1]Transcripts from the trial will be numbered I through VIII as follows:
Transcript of August 12, 2002, vol. I, docket #25 (Tr. I);
Transcript of August 13, 2002, vol. I, docket #26 (Tr. II);
Transcript of August 13, 2002, vol. II, docket #27 (Tr. III);
Transcript of August 14, 2002, vol. I, docket #28 (Tr. IV);
Transcript of August 14, 2002, vol. II, docket #29 (Tr. V);
Transcript of August 15, 2002, vol. I, docket #30 (Tr. VI);
Transcript of August 15, 2002, vol. II, docket #31 (Tr. VII); and

The prosecution's first witness, Ronal Swain, testified that he married Petitioner in 1987.  (Tr. III, 139-40.)  In June 1990, they adopted two young boys from foster care, Cody and Ronny.  (Tr. III, 140-41.)  At the time of the adoption, Cody was one and one-half years old and Ronny was two and one-half years old.  (Tr. III, 141.)  In October 1991, Mr. Swain separated from Petitioner.  (Tr. III, 141.)  They subsequently divorced.  (Tr. III, 142.)  Although Ronny and Cody lived with Petitioner, Mr. Swain regularly visited the children except for a period of time between 1994 and 1996 when his mother was ill.  (Tr. III, 143-44.)  From 1993 to 1997, Ronny and Cody lived with Petitioner in trailers in Michigan and Kentucky and in Petitioner's parents' home.  (Tr. III, 144-45.)  Ronny and Cody referred to their grandparents' house as the farm.  (Tr. III, 145.)

Mr. Swain remarried in November 1999 to Linda Swain.  (Tr. III, 145.)  In January 2000, the boys moved in with Linda and Mr. Swain.  (Tr. III, 145-46, 154.)  Ronny and Cody no longer wanted to live at the farm because Petitioner was in jail, their grandparents' worked at night and they were left alone.  (Tr. III, 146.)  Mr. Swain obtained custody of Ronny and Cody in November 2000.  (Tr. III, 146.)

In June 2001, Mr. Swain and Linda became aware of allegations of sexual contact between Ronny and "another individual." (Tr. III, 148.)  It was later revealed that the individual was Mr. Swain's granddaughter.  (Tr. III, 153.)  Around this time, Mr. Swain found sixteen pairs of Linda's undergarments hidden in Ronny's bedroom.  (Tr. III, 148-49.)  As of the trial, Mr. Swain continued to find female undergarments in Ronny's room.  (Tr. III, 150.)  Linda discussed the allegations of sexual misconduct with Ronny in Mr. Swain's presence.  (Tr. III, 153-54.)  At that time, Ronny disclosed what Petitioner had done to him.  (Tr. III, 149.)

---

Transcript of August 20, 2002, vol. I, docket #32 (Tr. VIII).

Ronald Swain (Ronny), the victim, testified that he was fourteen years old at the time of the trial. (Tr. III, 155-56.) After Petitioner and Mr. Swain separated, Ronny lived with Petitioner and Cody in a two-bedroom trailer. (Tr. III, 157-58.) When Ronny was five years old, he rode the bus to school. (Tr. III, 159-60, 176, 189-90.) On school mornings, Ronny knew the bus was coming when he heard it or saw the bus by his friend's house. (Tr. III, 159.) Cody would also watch for the bus outside while Petitioner dressed Ronny on the living room floor. (Tr. III, 159-60, 178.) When asked whether something happened to his penis, which Ronny referred to as his "wiggly," on those mornings Ronny first answered "I do not remember." (Tr. III, 160-61.) Ronny said that he was scared to be in the courtroom with Petitioner. (Tr. III, 162.) Ronny later recanted and stated that he did not want to say what happened out loud. (Tr. III, 167.) Before the bus arrived, Ronny testified that Petitioner would "put her mouth on [his] wiggly" when she changed his clothes. (Tr. III, 167.) This occurred every school morning. (Tr. III, 167-68, 178.) After Cody spotted the bus coming, he would knock on the door and declare that the bus was coming. (Tr. III, 168.) Petitioner would then quickly dress Ronny. (Tr. III, 168.) Petitioner cautioned Ronny not to tell anyone because she would get into a lot of trouble. (Tr. III, 168, 174.) Ronny followed her instructions and did not tell anyone. (Tr. III, 168.)

Around 1995 or 1996, Ronny lived in a two-bedroom house with his grandparents along with Petitioner and Cody. (Tr. III, 168-70.) Ronny's bedroom contained two beds, one queen-sized and one small bed. (Tr. III, 170.) Ronny slept with Petitioner in the large bed and Cody slept in the small bed. (Tr. III, 170, 195.) At night, Ronny wore boxer shorts but Petitioner usually did not wear anything. (Tr. III, 170-71, 195.) However, Petitioner would put clothes on when her father came upstairs to check on them. (Tr. III, 171.) When Ronny asked Petitioner to put some

- 4 -

clothes on, she refused.  (Tr. III, 196.)  If Cody slept with Ronny and Petitioner, then Petitioner would wear clothes to bed.  (Tr. III, 196.)  "Pretty much all week," Ronny would feel something wet, like spit, on his wiggly.  (Tr. III, 171-73.)  At the time Ronny felt something on his wiggly, he was not dreaming.  (Tr. III, 204-05.)  On those occasions, Petitioner was the only person in bed with Ronny.  (Tr. III, 172.)  To avoid sleeping next to Petitioner, Ronny would fall asleep on the downstairs couch, lie by saying he would be up in a minute or wait until Petitioner was asleep to climb into bed.  (Tr. III, 172.)

Ronny testified that Petitioner treated him differently than his brother Cody.  (Tr. III, 173.)  For example, Petitioner treated Ronny like her boyfriend and Cody like a slave.  (Tr. III, 173.) Petitioner allowed Ronny to drive a car before he was sixteen years old, gave more money to Ronny, assigned less chores to Ronny, and kissed Ronny on the lips.  (Tr. III, 173-74.)  Petitioner only kissed Cody on the forehead or cheek.  (Tr. III, 174.)

In June 2001, Ronny's father and step-mother approached him about inappropriately touching his cousin.  (Tr. III, 174-75, 181.)  Ronny was scared and thought he would get in trouble. (Tr. III, 182.)  When Ronny's step-mother asked Ronny if he had any similar experiences, Ronny told his step-mother about his sexual encounters with Petitioner.  (Tr. III, 174-75, 181, 185-86, 198.) Ronny testified that he did not tell his father and step-mother or anyone else about Petitioner's past behavior until June 2001 because he did not want Petitioner to get into trouble.  (Tr. III, 175, 182.) Ronny was angry that Petitioner was not home very often and scared that he would be in trouble. (Tr. III, 177-78, 182.)

Ronny ran away from his father's house a few times with Cody.  (Tr. III, 180.)  On one occasion, Cody called their grandparents to pick them up.  (Tr. III, 180.)  After picking up

- 5 -

Ronny and Cody, Ronny's grandparents asked him why he was saying those things about Petitioner. (Tr. III, 180-81.)  Because he did not want to talk about it, Ronny replied that the allegations were not true. (Tr. III, 181, 185.)  While at the farm, Ronny's grandparents and his aunt asked Ronny to testify that it did not happen.  (Tr. III, 194.)  Later, Ronny's grandparents asked a second time if the allegations were true.  (Tr. III, 183-84.)  Once again, Ronny lied because he did not want to talk to them about it.  (Tr. III, 184-85.)

The police, prosecutor and Child Protective Services interviewed Ronny twice.  (Tr. III, 187-88.)  In his first interview, Ronny told the interviewer that nothing happened because he was nervous.  (Tr. III, 186-88.)  For that interview, Ronny was only in the room with Sara Bleeker, the forensic interviewer, but the other individuals listened and watched the interview.  (Tr. III, 194-95; Tr. V, 27.)  Ronny told Ms. Bleeker that Petitioner was nice to him but not to Cody.  (Tr. III, 195.)  Ronny further mentioned that he moved into his father's house because Petitioner was being bad to him and Cody.  (Tr. III, 195.)  He also stated that he shared a room with his brother and Petitioner but he slept with Petitioner in a king-sized bed.  (Tr. III, 195.)  Petitioner slept naked.  (Tr. III, 195-96.)  Ronny asked Petitioner to wear clothes but she refused.  (Tr. III, 196.)  When Cody slept with Petitioner and Ronny, Petitioner would wear clothes.  (Tr. III, 196.)  Petitioner may have done something to Ronny while he slept because Ronny felt weird between his legs to the point of becoming nauseated when he woke up.  (Tr. III, 196.)

The second time Ronny met with the police, prosecutor and Child Protective Services he admitted that Petitioner had oral sex with him on numerous occasions.  (Tr. III, 187, 189.)  The second interview was set up exactly as the first interview with Ronny only meeting with Ms. Bleeker while the other individuals listened and watched.  (Tr. III, 196; Tr. V, 27.)  Ronny explained to Ms.

Bleeker that Petitioner engaged in oral sex with him when she changed his clothes on the living room floor. (Tr. III, 197.) Petitioner changed his clothes until he was eight or nine years old. (Tr. III, 198.) Again, Ronny stated that he slept in a large bed with Petitioner and Petitioner did not wear any clothes to bed. (Tr. III, 197-98.) Ronny reiterated that he was not saying those things about Petitioner to avoid being in trouble for the sexual encounter with his cousin. (Tr. III, 189, 192.)

Dr. Randall Haugen, a psychologist, testified as an expert in the area of child sexual abuse and offenders. (Tr. IV, 14, 16.) He found that a child may delay reporting sexual abuse for fear of being in trouble for what occurred, fear of losing a parent, in order to maintain his or her relationship with the perpetrator or due to threats by the perpetrator. (Tr. IV, 18-19, 21-22.) If a child is moved to a safer environment, then the child may report the abuse. (Tr. IV, 22.) Victims can also begin to participate in sexually inappropriate behavior by attempting to engage in sexual behavior with another child. (Tr. IV, 23-24.) Many times victims will disclose sexual abuse after people question the sexually inappropriate behavior. (Tr. IV, 24.) Dr. Haugen also found that an offender may groom the victim by spending extra time with them, and by showering them with money and gifts. (Tr. IV, 20-21.)

Commonly-seen side effects of sexually abusive behavior in children include regressive behavior such as nightmares, dreams, fearful responses, withdrawal from peer relationships, and fighting with other children at school. (Tr. IV, 26-28.) Abused children can also demonstrate sexually-reactive behavior by engaging in sexual acts with another child. (Tr. IV, 23-24.) A fetish is another behavior seen with sexually abused children. (Tr. IV, 28.) A fetish is a sexual attraction to a non-living object. (Tr. IV, 28.)

Dr. Haugen testified that he treated Ronny on a regular basis since August 2001. (Tr. IV, 28-29.) Dr. Haugen concluded that Ronny has exhibited behaviors of some children who have been sexually abused. (Tr. IV, 29.) Ronny demonstrated sexually-reactive behavior towards other children, compulsive masturbation, nightmares and disturbing dreams. (Tr. IV, 29.) He also hoarded women's underwear. (Tr. IV, 29.)

On cross-examination, Dr. Haugen noted that a delay in reporting may indicate that a child was led by an adult or an individual trying to protect himself from potential accusations. (Tr. V, 6.) In cases of false allegations, Dr. Haugen stated that it is unlikely to see fetishes, a child acting out, aggressiveness or a child exhibiting anxiousness, fearfulness or embarrassment. (Tr. V, 8.) Dr. Haugen determined that Ronny exhibited signs of anxiousness, fearfulness and embarrassment. (Tr. V, 8-9.) Dr. Haugen cautioned, however, that there is not a group of symptoms, which specifically points to sexual abuse. (Tr. V, 9.)

Cody Swain, Petitioner's adopted son, testified that he was thirteen years old and in the eighth grade at school at the time of the trial. (Tr. V, 11-12, 18.) After his parents divorced, Cody lived with Petitioner and his brother, Ronny, in a trailer. (Tr. V, 12-13.) He slept in a bunk bed with Ronny in one bedroom and Petitioner slept in another bedroom. (Tr. V, 13.) On three or four occasions, Cody waited for the bus by himself. (Tr. V, 14, 20.) Cody would then yell to Ronny when the bus came. (Tr. V, 14.) The bus stopped at the end of their driveway. (Tr. V, 20.)

Cody explained that Petitioner treated him differently than Ronny. (Tr. V, 14-15.) Petitioner gave more money to Ronny. (Tr. V, 15, 17.) Petitioner also treated Ronny as a boyfriend by kissing him on the lips. (Tr. V, 15, 16-17.) Petitioner only kissed Cody on the cheek. (Tr. V, 15.) Cody performed more chores than Ronny. (Tr. V, 15.) Cody felt angry at Petitioner for

- 8 -

treating him differently than Ronny and for not being around when he needed her.  (Tr. V, 17, 20.)

When Cody lived with his grandparents on the farm, he slept in a small bed and Ronny and Petitioner slept in a large bed in the same bedroom.  (Tr. V, 15-16.)  Cody never saw Petitioner do anything bad to Ronny.  (Tr. V, 20.)

Sara Ann Bleeker testified that she works as a forensic interviewer for Sexual Assault Services.  (Tr. V, 22.)  A forensic interviewer gains facts in a non-judgmental and age-appropriate manner by following several Michigan protocols.  (Tr. V, 23, 32.)  Another team, which includes the assistant prosecutor, a Child Protective Services representative and a law enforcement representative, watches and listens to the interview from a separate room.  (Tr. V, 26-27.)  In this case, the extended team watched Ms. Bleeker's interview via a two-way mirror and listened through a ceiling microphone.  (Tr. V, 27.)  Ms. Bleeker interviewed both Cody and Ronny Swain.  (Tr. V, 33.)  She interviewed Ronny twice and Cody once.  (Tr. V, 33.)

In the first interview, Ronny stated that Petitioner slept naked next to him.  (Tr. V, 38.)  However, Petitioner would wear clothes if Cody was in bed with Petitioner. (Tr. V, 38.)  Ronny also mentioned that he thought something happened to him while he was sleeping next to Petitioner.  (Tr. V, 38.)  Finally, Ronny told Ms. Bleeker that Petitioner would help him dress and undress.  (Tr. V, 38-39.)  When asked whether Petitioner ever did anything with his private parts, Ronny answered "not that I know of" in the first interview.  (Tr. V, 39.)

Detective Guy Picketts of the Calhoun County Sheriff's Department testified he was assigned to the case in August 2001.  (Tr. V, 41-44.)  Detective Picketts attended the second forensic interview of Ronny and Cody Swain on August 17, 2001.  (Tr. V, 44, 51.)  In that interview, Ronny indicated that the abuse occurred at two different locations in Calhoun County.  (Tr. V, 44, 58-59.)

He stated that Petitioner performed oral sex on him while changing his clothes on the living room floor in one location and performed oral sex on him in a big bed in another location. (Tr. V, 58-59.)

At the interview, Detective Picketts also interviewed Petitioner on August 17, 2001. (Tr. V, 44-45.) At Petitioner's interview, Detective Picketts informed Petitioner that Ronal and Linda Swain submitted a formal complaint against her for criminal sexual conduct with Ronny. (Tr. V, 45-47, 61-62.) When Detective Picketts explained that the complaint concerned oral sex, Petitioner became extremely vocal and animated. (Tr. V, 47.) Petitioner blurted "I never sucked my kid's dick" before Detective Picketts could finish his statement. (Tr. V, 47, 54.) Detective Picketts was surprised by Petitioner's outburst because he never indicated, other than using the words "oral sex," that Petitioner had performed oral sex on Ronny. (Tr. V, 47-48, 54.)

At the interview, Petitioner stated that the charges were fabricated and Ronal and Linda Swain forced her sons to make those statements. (Tr. V, 48.) Detective Picketts noted that if a person is being truthful, his or her story does not change. (Tr. V, 51.) If a person is lying, then his or her story will change from time to time. (Tr. V, 51.) Initially, Petitioner stated that Ronny lied. (Tr. V, 48-49, 54.) Later in the interview, however, she told Detective Picketts that Ronny never lied. (Tr. V, 49, 54.) Petitioner also denied changing Ronny's clothes when he was eight or nine years old. (Tr. V, 49-50, 54.) Later, Petitioner admitted to changing Ronny's clothes when he was eight and nine years old to "hurry him up." (Tr. V, 50.)

Deborah Charles, a state prisoner, testified for the prosecution. (Tr. V, 62-63.) At the time of her testimony, she was incarcerated at the Robert Scott Correctional Facility serving several sentences for uttering and publishing convictions. (Tr. V, 63-64, 95.) Ms. Charles did not receive anything in exchange for her testimony in this case. (Tr. V, 64.) In 2001, Ms. Charles met

Petitioner at the Robert Scott Correctional Facility in the prison yard. (Tr. V, 68, 73.) During that meeting, Petitioner denied "suck[ing] [her] son's dick" and called the "little bastard" a liar. (Tr. V, 71.) In a later meeting, Petitioner confided in Ms. Charles that she may have slept naked with Ronny once. (Tr. V, 75-76.) Petitioner then proceeded to tell Ms. Charles that she had oral sex with Ronny because she was on crack and did not know what she was doing. (Tr. V, 76.) Petitioner stated that Ronny was so much more attractive than Cody; and, thus, she would kiss Ronny on the lips and Cody on the cheek. (Tr. V, 77.) Ms. Charles did not get the impression that Petitioner performed oral sex on Ronny because of the drugs. (Tr. V, 77.) In December 2001, Ms. Charles contacted the Calhoun County Prosecutor. (Tr. V, 81-84.) Ms. Charles sent a letter to the prosecutor because she was molested as a child and she did not want Petitioner to have the opportunity to molest again. (Tr. V, 83, 91.) Once Petitioner learned that Ms. Charles may testify at her trial, she attempted to threaten Ms. Charles to prevent her from testifying. (Tr. V, 85-88.)

The defense called Ronny's maternal grandmother, Mary Stephens, as their first witness. (Tr. V, 100.) Ms. Stephens testified that her daughter gave Ronny up for adoption. (Tr. V, 100-01.) Ms. Stephens kept in contact with Ronny and Cody after they were adopted until April 2001. (Tr. V, 101-02.) Ronny and Cody never appeared to be sexually abused. (Tr. V, 102.) Ms. Stephens thought Petitioner was a good mother despite Petitioner's drug use. (Tr. V, 107-08.) Ms. Stephens, however, never attempted to visit Ronny and Cody at the trailer. (Tr. V, 107.) As a result, Ms. Stephens did not know if Ronny and Cody had adequate food, whether they were ever left unattended by Petitioner or whether Petitioner used drugs in front of them. (Tr. V, 107.)

David Krajewski, Ronny's counselor, testified next for the defense. (Tr. V, 108-09.) Mr. Krajewski counseled Ronny from March 2000 until July 2001 at the Oakridge Counseling

Center.  (Tr. V, 109.)  Ronny's father and step-mother requested the counseling sessions for Ronny.

(Tr. V, 109-10.)  Mr. Krajewski counseled Ronny for anger management, discipline problems,

fighting and school-related problems.  (Tr. V, 110-12.)  He found Ronny to be impulsive and with

a low IQ.  (Tr. V, 111, 113.)  Mr. Krajewski acknowledged that Ronny felt rejected by his mother.

(Tr. V, 117.)  In June, Mr. Krajewski became aware of the alleged sexual abuse between Petitioner

and Ronny.  (Tr. V, 114.)  While Ronny acknowledged that something inappropriate happened with

Petitioner, he did not directly say "my mom had oral sex with me . . . ."  (Tr. V, 115.)  When the

allegations of sexual abuse surfaced, Mr. Krajewski referred Ronny to another counselor.  (Tr. V,

115.)

Julia Johnson testified that she is a special education teacher at Union City Middle

School.  (Tr. V, 119.)  She taught mentally and emotionally impaired children, including Ronny, in

second and third grades.  (Tr. V, 119-20.)  She observed behavioral problems in Ronny.  (Tr. V,

120.)  Ronny was extremely defiant and stubborn in her classroom.  (Tr. V, 120-21.)  As soon as

Ronny could control his behavior, he was transferred to a learning disabilities teacher.  (Tr. V, 123.)

George Johnson, Petitioner's father, testified that Petitioner lived in a couple of his

trailers between 1993 and 1996.  (Tr. V, 124.)  When Mr. Johnson sold his trailer, Petitioner, Ronny

and Cody moved in with Mr. and Mrs. Johnson for approximately two years.  (Tr. V, 125-26, 136.)

Mr. Johnson noted that Petitioner loved Ronny and Cody, spoiled them and did not treat them

differently.  (Tr. V, 125-26.)  Although he characterized Petitioner as a good mother, Mr. Johnson

acknowledged that she was not such a good mother when she was abusing drugs.  (Tr. V, 137.)

When Petitioner used drugs, she could be gone for weeks at a time.  (Tr. V, 137.)  Because of

Petitioner's drug use, Mr. Johnson eventually requested Petitioner to be arrested by the police.  (Tr.

V, 130-31, 136.)  At that time, Mrs. Johnson became a third-party custodian for the boys.  (Tr. V, 139.)

Mr. Johnson worked third shift at a GM plant from 11:00 p.m. until 7:00 a.m.  (Tr. V, 126-27, 137-38.)  At night, Petitioner, Ronny and Cody slept in one room at Mr. Johnson's house.  (Tr. V, 127.)  Mr. Johnson never noticed Petitioner sleeping in the nude.  (Tr. V, 127.)  He would never have allowed anyone to sleep in the nude at his house.  (Tr. V, 127.)  Mr. Johnson also never witnessed any sexual abuse.  (Tr. V, 128, 136.)  Mr. Johnson, however, admitted that he did not know what happened in the upstairs bedroom between 11:00 p.m. and 7:00 a.m. on work days.  (Tr. V, 138.)

Since Ronny and Cody moved in with their father two years ago, Mr. Johnson has not seen the boys very much.  (Tr. V, 132-33.)  On two occasions, however, Ronny and Cody ran away from home and contacted Mr. Johnson.  (Tr. V, 133-36.)  The first time, Mr. Johnson picked Ronny and Cody up around 1:00 a.m. and brought them back to the farm.  (Tr. V, 134, 142-43.)  After 1:00 a.m., Mr. Johnson questioned Ronny about his statements against Petitioner in the presence of Mrs. Johnson, Cody and Mr. Johnson's daughter.  (Tr. V, 144-46.)  Ronny replied that his accusations were not true.  (Tr. V, 146.)  The second time Ronny and Cody ran away, Mr. Johnson could not determine where they were located so he did not pick them up.  (Tr. V, 135-36, 142.)

Dean Worden, a social worker with the Calhoun County Intermediate School District, testified that he worked with Ronny between kindergarten and fifth grade.  (Tr. V, 147-50.)  He generally works with children who have behavioral as well as academic-adjustment problems.  (Tr. V, 151.)  When Ronny first entered school, Mr. Worden noticed that he was inattentive, active,

- 13 -

impulsive, and sometimes defiant and aggressive.  (Tr. V, 150.)  Mr. Worden found Ronny to be

emotionally-impaired.  (Tr. V, 149.)  As a result, Ronny entered special education programming.

(Tr. V, 149.) With attention deficit hyperactivity disorder (ADHD) medication and some stability

in his environment, Ronny no longer presented symptoms of being emotionally-impaired three years

later.  (Tr. V, 149-50.)  However, the school psychologist still diagnosed Ronny with a learning

disability. (Tr. V, 149.)  Mr. Worden continued to counsel Ronny until he reached the sixth grade.

(Tr. V, 149-50.)

       During the time Mr. Worden spent with Ronny, he noticed academic, social,

emotional and behavioral problems at school.  (Tr. V, 151.)  Mr. Worden thought Ronny was

somewhat spoiled and indulged, which caused him to be a little more defiant than other students.

(Tr. V, 151.)   Mr. Worden noticed a few times where Ronny would come to school tardy and

disheveled.  (Tr. V, 152.)  Mr. Worden was concerned that Petitioner had some personal problems,

which may have affected her parenting of Ronny.  (Tr. V, 153.)

       Steven Way testified that he dated Petitioner from May 1994 until the summer of

1995.  (Tr. V, 156.)  He lived in a trailer with Petitioner, Ronny and Cody in Calhoun County

between December 1994 and June or July 1995. (Tr. V, 157.) Mr. Way never witnessed any sexual

abuse in the trailer.  (Tr. V, 158.)   Mr. Way also did not notice anything improper between

Petitioner and Ronny even when Petitioner dressed Ronny.  (Tr. V, 159.)  Petitioner appeared to be

a good, conscientious mother although she smoked marijuana in the trailer during that time.  (Tr.

V, 158, 160.)  Mr. Way worked Monday through Friday, 7:00 a.m. to 3:30 p.m. in the summer

months, and 8:00 a.m. to 4:30 p.m. in the winter months; however, he was unemployed at times.

(Tr. V, 158-59.)  Generally, Mr. Way left the trailer before everybody else in the morning when he

- 14 -

was employed. (Tr. V, 160-61.)  Mr. Way recalled that the bus stopped at the end of the trailer's driveway.  (Tr. V, 159.)   He could see the bus stop from the windows in the living room.  (Tr. V, 159.)

Ruth Kidney, Petitioner's friend, testified as a character witness.  (Tr. V, 162-63.)  She had known Petitioner for twenty-five to thirty years at the time of the trial.  (Tr. V, 162-63.)  Ms. Kidney stated that Petitioner has a reputation for being honest.  (Tr. V, 163-64.)  Ms. Kidney, however, had forgotten that Petitioner was convicted of a felony for larceny over $100.  (Tr. V, 164-65.)

Sandy Anderson, Petitioner's sister, testified that she frequently watched Ronny and Cody before she moved to Kentucky in 1997.  (Tr. V, 167-68.)  Ms. Anderson lived down the road from Petitioner between 1991 and 1997.  (Tr. V, 167-68.)  Ms. Anderson found that Petitioner struggled with drugs after her divorce from Mr. Swain in late 1991.  (Tr. V, 171-73.)  She described Petitioner as a wonderful mother, very attentive to how Ronny and Cody dressed and their hygiene. (Tr. V, 168-69.)  Ms. Anderson noted that many times it took Ronny too long to get ready in the morning so Petitioner or Ms. Anderson would have to dress him in order to avoid missing the bus. (Tr. V, 169-70.)  She never witnessed any sexual abuse in Petitioner's trailer.  (Tr. V, 170.)  A couple days a week, Ms. Anderson stopped by on her way to school to see if Ronny and Cody needed a ride to school.  (Tr. V, 180-83.)  In 1997, Ms. Anderson moved to Kentucky.  (Tr. V, 167-68, 186.)  Petitioner also moved to Kentucky with Ronny and Cody to live with Ms. Anderson.  (Tr. V, 186.)  Petitioner's move, however, was in violation of a court order so she had to return to Michigan with Ronny and Cody.  (Tr. V, 186.)

When Ronny and Cody first ran away to the farm, Ms. Anderson questioned them about their testimony in this case. (Tr. V, 186-87.)  The boys stated that it was all a lie. (Tr. V, 187.)        Stanley Clayton, Petitioner's friend, testified as a character witness. (Tr. V, 189-91.) He had known Petitioner for at least twenty years. (Tr. V, 188, 190-91.)  He found her to be honest. (Tr. V, 190-91.)  Mr. Clayton only recently became aware of the larceny charge against Petitioner. (Tr. V, 192.)

Linda Swain, the step-mother of Ronny and Cody, testified that she married Ronal Swain in 1999. (Tr. V, 193, 204.)  She has known Ronny and Cody since 1998. (Tr. V, 204.)  In November 2000, Ms. Swain acquired physical custody of the boys. (Tr. V, 207.)  On June 25 or 26 of 2001, Linda became aware of an incident of sexual misconduct between Ronny and his cousin. (Tr. V, 194-95, 197.)  Ronny initially denied the sexual misconduct but later admitted to it. (Tr. V, 195.)  Linda asked Ronny where he came up with an idea like that because it was bizarre that he would use his tongue. (Tr. V, 196-97.)  Linda expected Ronny to say that he saw it on television. (Tr. V, 196-97.)  Rather, Ronny stated that Petitioner did it to him. (Tr. V, 196.)  Linda then asked Ronal Swain to come into the room and Ronny repeated the same story to his father. (Tr. V, 197.)

Linda did not report the allegations to the police because Ronny had a counseling appointment later that day or the next day. (Tr. V, 198-201.)  At his counseling appointment, Ronny told David Krajewski about Petitioner's sexual abuse. (Tr. V, 198, 201.)  Mr. Krajewski then called Linda in for a conference. (Tr. V, 198.)   After their meeting, Linda contacted Child Protective Services, who subsequently contacted the police. (Tr. V, 200-01.)  On July 30, Ms. Swain drove Ronny to the Child Advocacy Center to be interviewed by the Crisis Intervention Team. (Tr. V,

201-02.)  After that interview, the Crisis Intervention Team set up another interview for Ronny and Cody in August.  (Tr. V, 203.)

Lynette Wilson, a state prisoner, testified that she is currently incarcerated with the Michigan Department of Corrections for an attempted uttering and publishing conviction.  (Tr. VI, 6-7.)  While she only met Petitioner twice, Ms. Wilson was more familiar with Ms. Deborah Charles.  (Tr. VI, 7-8.)  She talked to Ms. Charles regarding Petitioner's case.  (Tr. VI, 8-9.)  During that conversation, Ms. Charles told Ms. Wilson that she was lying about Petitioner.  (Tr. VI, 9.)  Ms. Wilson then mentioned the conversation to Petitioner but did not contact the police or prosecutor. (Tr. VI, 12-13.)

Petitioner testified on her own behalf. (Tr. VI, 16.)  She married Ronal Swain in 1988, when she was twenty-eight years old.  (Tr. VI, 17.)  They adopted Ronny and Cody.  (Tr. VI, 18.)  Petitioner smoked marijuana occasionally with Mr. Swain.  (Tr. VI, 19-20; Tr. VII, 31.) Petitioner and Mr. Swain divorced in 1991.  (Tr. VI, 17-18.)  After the divorce, Petitioner dated Eldon McDowell for a year and one-half and started using cocaine.  (Tr. VI, 18-19, 21; Tr. VII, 27, 32.)  She stole from her parents and became a prostitute to pay for the cocaine.  (Tr. VI, 19.) Petitioner would often use cocaine after work while family or a babysitter watched Ronny and Cody. (Tr. VII, 27-29, 49.)  At this time, Ronny and Cody were three to five years old.  (Tr. VII, 30.)

Petitioner lived in three different trailers with Ronny and Cody after her divorce.  (Tr. VI, 22-26.)  Petitioner moved into the third trailer with her boyfriend, Steven Way, in 1994 or 1995. (Tr. VI, 26.)  Petitioner smoked pot in front of Ronny and Cody with Mr. Way but did not use cocaine.  (Tr. VII, 28, 31-35.)  At this time, Ronny and Cody attended elementary school.  (Tr. VI, 27.)  Ronny was very difficult in the morning because he had ADHD and would not behave.  (Tr.

VI, 32-33.) Around 1996, Petitioner's relationship ended with Mr. Way. (Tr. VI, 27.) In 1996 or

1997, Petitioner began using cocaine again while living with Dennis Book. (Tr. VI, 29-30, 36-37.)

Petitioner dated Mr. Book until she moved to Kentucky. (Tr. VI, 30.)

Petitioner, Ronny and Cody moved to Kentucky with Petitioner's sister, Sandra

Anderson. (Tr. VI, 35, 37; Tr. VII, 41.) After approximately four and one-half months in Kentucky,

Petitioner returned to Michigan to live at the farm because she violated a court order. (Tr. VI, 37-

38; Tr. VII, 41-45.) While living with her parents, Petitioner slept in a bedroom with a double or

queen-sized bed and a twin bed. (Tr. VI, 38; Tr. VII, 58.) Cody mainly slept in the twin bed

because he wet the bed. (Tr. VII, 58-59.) Petitioner slept with Ronny in the large bed until he was

eleven years old. (Tr. VII, 58-59.) Petitioner did not sleep naked. (Tr. VII, 58-59.) Petitioner

testified that nothing went on in the bed between her and Ronny. (Tr. VII, 58-59, 61.)

Petitioner started using crack again when she returned to Michigan. (Tr. VI, 41-42.)

She became a prostitute to pay for the crack. (Tr. VII, 8.) Petitioner also stole from her parents.

(Tr. VI, 41-42.) Eventually, Petitioner turned herself into the police. (Tr. VI, 42.) After her arrest,

Petitioner pled guilty to larceny. (Tr. VI, 42.) Petitioner received probation for the larceny

conviction, but she violated her probation on three different occasions. (Tr. VI, 42-46.) She

ultimately lost physical custody of Ronny and Cody to Ronal and Linda Swain. (Tr. VI, 46-48, 50.)

Between April 23 and August 13, 2001, Petitioner remained in prison for a parole violation. (Tr.

VI, 51-52.)

On August 16 or 17, 2001, Petitioner returned to jail for the present criminal sexual

conduct charges. (Tr. VI, 53-54, 57; Tr. VII, 3.) At that time, Detective Picketts questioned

Petitioner regarding Ronny's allegations of oral sex. (Tr. VII, 3.) Petitioner said "my kid doesn't

lie and I didn't suck his dick."  (Tr. VII, 3.)  Detective Picketts stated "how did you know [Ronny] said you sucked his dick?"  (Tr. VII, 3.)  Petitioner replied that oral sex is "sucking each other's privates."  (Tr. VII, 3-4.)  Petitioner admitted that she contradicted herself as to whether Ronny was truthful or not.  (Tr. VII, 4.)  Originally, she told Detective Picketts that Ronny never lied except about brushing his teeth occasionally.  (Tr. VII, 4-5, 77-78.)  Petitioner, however, stated that Ronny is lying about the sexual assault allegations because he did not want to get into trouble for molesting a three year old and exposing himself to a five-year old.  (Tr. VII, 5, 79-81.)

Petitioner denied sexually assaulting her son.  (Tr. VII, 5.)  She stated, "he is an out-out liar.  I've never did that."  (Tr. VII, 5.)  While Petitioner dressed Ronny when he was young, she stated that she never sexually assaulted him.  (Tr. VII, 5.)  She dressed him because he would not behave or dress quickly.  (Tr. VII, 5, 54.)  She always dressed him in front of Cody, Steven Way, Dennis Book or her parents.  (Tr. VII, 5-6, 54, 65.)  She never sent Cody to the bus stop before the bus came.  (Tr. VII, 6.)  The boys would watch for the bus out the window of the trailer.  (Tr. VII, 6.)  When the bus came, they would go to the bus together.  (Tr. VII, 6.)  Petitioner states that she never was high on crack around Ronny and Cody.  (Tr. VII, 6-7.)

Petitioner denied sleeping in the nude with Ronny or Cody except when she lived with Eldon McDowell because the boys may have come into Petitioner's bed after waking up in the middle of the night or in the morning.  (Tr. VII, 7.)  Petitioner also denied performing oral sex on Ronny while he slept at the farm, having intercourse or oral sex with Ronny or Cody, laying naked with either child, and treating the boys differently.  (Tr. VII, 8-9, 26, 82-86.)  Petitioner admitted to smoking crack and being a prostitute in order to buy crack.  (Tr. VII, 8-9.)   Petitioner stated that Cody and Ronny lied when they testified that they were treated differently.  (Tr. VII, 83-85.)

- 19 -

Petitioner received two letters from the boys while in prison.  (Tr. VII, 12-14.)  Both letters were admitted into evidence.  (Tr. VII, 12-15.)  The first letter dated May 28, 2001 from Ronny and Cody asked Petitioner to stop being a big baby, get a life and leave them alone.  (Tr. VII, 12.)  Cody sent a second letter dated May 31, 2001 asking Petitioner to stop being a big baby.  (Tr. VII, 14.)  The May 31 letter further stated that it made Cody mad when Petitioner ran around, she bossed him around, talked bad about his father and when she lied to them.  (Tr. VII, 14.) The letter finally requests Petitioner to leave Ronny and Cody alone until she is released from prison.  (Tr. VII, 14.)

Petitioner testified that the boys attended school at Union City prior to and after living in Kentucky.  (Tr. VI, 31, 40.)  Ronny and Cody either rode the bus or were dropped off at school.  (Tr. VI, 31-32.)  Ronny did not behave well, in part because he had ADHD.  (Tr. VI, 32.)  Petitioner would also receive calls from Ronny's school regarding his behavior problems.  (Tr. VI, 34.)

Petitioner met Deborah Charles at the Robert Scott Correctional Facility in November 2001. (Tr. VII, 16.)  Petitioner mentioned that her son had molested a little girl to Ms. Charles.  (Tr. VII, 17.)  Petitioner further explained that her son lied to get out of trouble by saying that Petitioner had sucked his penis.  (Tr. VII, 17.)   During that meeting, Petitioner read some of the police report to Ms. Charles and allowed Ms. Charles to review the police report and take notes.  (Tr. VII, 18-20, 66.)  Petitioner denied confessing to Ms. Charles.  (Tr. VII, 21, 25, 73.)

Lynette Wilson approached Petitioner in prison to discuss Ms. Charles' potential testimony.  (Tr. VII, 23-25.)  Ms. Wilson befriended Ms. Charles.  (Tr. VII, 24.)  Ms. Charles told

Ms. Wilson that she had lied about Petitioner's actions to reduce the charges against her.  (Tr. VII, 24-25.)   The defense rested.  (Tr. VII, 86.)

The prosecutor recalled Detective Guy Picketts to testify.  (Tr. VII, 86.)  Detective Picketts reiterated that Petitioner stated that she was closer to Ronny than Cody.  (Tr. VII, 87-88.)  Detective Picketts also met with Lynette Wilson prior to her testimony.  (Tr. VII, 88-89.)  Ms. Wilson had two brief meetings with Deborah Charles.  (Tr. VII, 89.)  During their conversation, Ms. Wilson was confused as to whether Ms. Charles stated that Petitioner was lying or whether she [Ms. Charles] was lying.  (Tr. VII, 89.)  In her testimony, however, Ms. Wilson stated that Petitioner was lying.  (Tr. VI, 9; Tr. VII, 89-90.)

The prosecutor also called Donna Trapani to testify on rebuttal.  (Tr. VII, 91.)  Ms. Trapani is incarcerated at the Robert Scott Correctional Facility with Petitioner and Deborah Charles.  (Tr. VII, 91-92.)  Ms. Trapani witnessed Petitioner trying to coerce Ms. Charles into signing a document so Petitioner would not have to go to trial.  (Tr. VII, 93-94.)  On several occasions, Ms. Trapani also saw Petitioner threatening Ms. Charles if she testified against her.  (Tr. VII, 94-96.)  The prosecution concluded rebuttal.  (Tr. VII, 97.)

At the conclusion of trial, the jury found Petitioner guilty of four counts of CSC I. (Trial Tr. "Verdict", 7, Aug. 20, 2002, docket #32.)  On October 14, 2002, Petitioner was sentenced to serve four concurrent terms of twenty-five to fifty years.  (Trial Tr. "Sentencing", 10, Oct. 14, 2002, docket #33.)

B.      **Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  Her initial brief, which was filed by counsel on April 7, 2003, and a "cured" brief[2], which was filed by counsel on April 30, 2003, raised the following seven claims:

I.      DEFENDANT WAS DENIED HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY HER TRIAL ATTORNEY'S ADMITTED FAILURE TO LIST DR. STEPHEN MILLER AS A DEFENSE EXPERT WITNESS PRIOR TO TRIAL AND BY FILING DEFENDANT'S PROPOSED WITNESS LIST JUST DAYS PRIOR TO DEFENDANT'S TRIAL.

II.     TRIAL COUNSEL'S FAILURE TO OBJECT TO PATENTLY INADMISSIBLE AND HIGH[]LY PREJUDICIAL EVIDENCE CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT AND REQUIRES A NEW TRIAL WHERE THE ERRORS WERE SO SUBSTANTIAL THAT THEY COULD HAVE CHANGED THE OUTCOME OF THE TRIAL.

III.    TRIAL COUNSEL'S ELICITATION AND THE PROSECUTION'S FOLLOW-UP QUESTIONS[] OF [THE] PROSECUTION['S] EXPERT WITNESS THAT THE COMPLAINANT'S ALLEGATIONS AGAINST DEFENDANT WERE TRUE DENIED DEFENDANT A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL.

IV.     THE SCOPE OF [THE] PROSECUTION'S EXPERT WITNESS'[] TESTIMONY[] [] WENT BEYOND THE PERMISSIBLE RANGE OF DISCUSSING THE TYPICAL SYMPTOMS OF A VICTIM OF CHILD SEXUAL ABUSE.

V.      DEFENDANT'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FEDERAL AND STATE CONSTITUTIONS WAS DENIED WHERE TRIAL COUNSEL DID NOT OBJECT TO THE ADMISSION OF NUMEROUS UNCHARGED BAD ACTS AND OTHER EVIDENCE AND INFORMATION WHERE THE PROBATIVE VALUE WAS FAR OUTWEIGHED BY ITS PREJUDICIAL EFFECT.

_____

[2]As the Court of Appeals accepted Petitioner's "cured" brief, i.e. amended brief, for filing, this Court assumes that the Court of Appeals reviewed Petitioner's amended brief.

      VI.    DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL
              COUNSEL AND A FAIR TRIAL BY HER ATTORNEY'S FAILURE TO
              PRESENT AVAILABLE TESTIMONY AND EVIDENCE THAT COULD
              HAVE CREATED A REASONABLE DOUBT AS TO DEFENDANT'S
              GUILT.

      VII.    DEFENDANT IS ENTITLED TO A NEW TRIAL BASED ON
              RECANTATION OF THE COMPLAINANT.

(*See* Def.-Appellant's Am. Br. on Appeal, docket #39.) By unpublished opinion issued on February

24, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's

convictions and sentences. (*See* Mich. Ct. App. Opinion (MCOA Op.), Feb. 24, 2004, docket #39.)

Petitioner did not file an application for leave to appeal in the Michigan Supreme Court.

### C.    **Post-Conviction Relief**

      Petitioner filed several motions for a new trial in the Calhoun County Circuit Court.

The first motion for a new trial dated March 3, 2003 was based solely on newly discovered evidence.

Petitioner filed an addendum to her motion for a new trial with ineffective assistance of counsel

claims on April 7, 2003 and requested a *Ginther*[3] hearing. The Calhoun County Circuit Court denied

the motion for a new trial based on newly discovered evidence on May 5, 2003.[4] (*See* Calhoun

County Circuit Court Order, May 5, 2003, docket #7.) The trial court, however, granted Petitioner's

request for a *Ginther* hearing on her ineffective assistance of counsel claims. In her addendum to

the motion for new trial, Petitioner listed the following claims of ineffective assistance of trial

counsel:

---

[3]*People v. Ginther*, 212 N.W.2d 922 (Mich. 1973) (requiring a hearing, findings, and a court ruling when a defendant claims his assigned lawyer is inadequate or deficient.)

[4]The Calhoun County Circuit Court did not rule on Petitioner's addendum when it denied the March 3, 2003 motion on May 5, 2003. (*See Ginther* Hearing Tr. (Ginther Tr. I), vol. 1, 3, docket #34.)

> DEFENDANT WAS DENIED HER CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY HER TRIAL ATTORNEY'S ADMITTED FAILURE TO LIST DR. STEPHEN MILLER AS A DEFENSE EXPERT WITNESS PRIOR TO TRIAL AND BY FILING DEFENDANT'S PROPOSED WITNESS LIST JUST DAYS PRIOR TO DEFENDANT'S TRIAL.
>
> TRIAL COUNSEL'S FAILURE TO OBJECT TO PATENTLY INADMISSIBLE AND HIGH[]LY PREJUDICIAL EVIDENCE CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT AND REQUIRES A NEW TRIAL WHERE THE ERRORS WERE SO SUBSTANTIAL THAT THEY COULD HAVE CHANGED THE OUTCOME OF THE TRIAL.

(*See* Addendum to Mot. for Relief from J., Apr. 7, 2003, 1, 4, docket #7.)  The trial court held *Ginther* hearings on June 4 and 19, 2003.  At the conclusion of the *Ginther* hearings, the trial court rejected all of Petitioner's claims of ineffective assistance of counsel.  (*See* Ginther Tr. (Ginther Tr. IV), vol. II, June 19, 2003, 37-41, docket #37.) On July 11, 2003, the trial court also denied Petitioner's motion for a new trial based on the ineffective assistance of counsel claims.  (*See* Calhoun County Circuit Court Order, July 11, 2003, docket #7.)  Petitioner did not appeal the May 5, 2003 or July 11, 2003 decision of the Calhoun County Circuit Court to the Michigan appellate courts.

Petitioner filed a motion for relief from judgment on September 1, 2004 in the Calhoun County Circuit Court raising the following two grounds for relief: (1) ineffective assistance of counsel; and (2) newly discovered evidence.  (*See* Mot. for Relief. from J., docket #8.)  On September 15, 2004, the trial court denied Petitioner's motion after finding the grounds lacked merit. The trial court further reasoned that the alleged newly discovered evidence would not have result in a different verdict, even assuming that all the foundational elements were satisfied, a new trial was granted and the claimed newly discovered evidence was admissible at the trial.  (*See* Calhoun

County Circuit Court Order, Sept. 15, 2004, docket #8.)  Petitioner did not seek leave to appeal in the Michigan appellate courts.

On or about February 7, 2005, Petitioner filed a motion for a new trial on several grounds of newly discovered evidence.  The trial court held a hearing on the motion on February 14, 2005 and subsequently denied Petitioner's motion on February 28, 2005.  (*See* Calhoun County Circuit Court Order, Feb. 28, 2005, docket #9; Mot. for New Trial Tr., Feb. 14, 2005, docket #38). Petitioner then appealed the decision to the Michigan Court of Appeals.  The Michigan Court of Appeals denied Petitioner's delayed application for leave to appeal on May 20, 2005 as follows:

> The delayed application for leave to appeal is DISMISSED for lack of jurisdiction because the defendant cannot appeal the denial or rejection of a successive motion for relief from judgment.  See MCR 6.512(G)(1).  Regardless of the title placed on the pleading, the motion filed by defendant in February of 2005 was a successive motion for relief from judgment.  See MRC 6.501.  As noted by both the prosecutor and the trial court what was submitted would not satisfy the four conditions required for newly discovered evidence.

(Mich. Ct. App. Order, May 20, 2005, docket #40).  Petitioner did not seek leave to appeal to the Michigan Supreme Court.

## **Discussion**

This action is governed by the Antiterrorism and Effective Death Penalty Act.  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001)  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue."  *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).  A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing

*Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

A.       **Newly Discovered Evidence: Grounds II, III & IV**

Petitioner's second, third and fourth grounds for habeas corpus relief set forth arguments about why newly discovered evidence demonstrates that she is actually innocent of the offense for which she is incarcerated. In her second ground for habeas corpus relief, Petitioner claims that the trial court erred by failing to grant a new trial based upon the recantation of Ronny Swain's testimony to the Albion Department of Public Safety (ADPS). Petitioner raised her claim only on direct appeal to the Michigan Court of Appeals. In support of her claim, Petitioner provided

- 27 -

Ronny's September 21, 2002 statement to the ADPS, the ADPS Incident Report regarding Ronny's

revelations and Petitioner's January 23, 2003 polygraph report.  (*See* Def.-Appellant's Am. Br. on

Appeal, Exs. 9 & 10, docket #39.)[5]  Petitioner passed the polygraph examination after denying that

she performed oral sex on Ronny.  (*See* Def.-Appellant's Am. Br. on Appeal, Ex. 10, docket #39.)

In rejecting Petitioner's claim on appeal, the Michigan Court of Appeals held:

> Defendant also argues that the trial court abused its discretion when it denied [her] motion for a new trial on the basis of newly discovered evidence. We disagree.
>
> To justify a new trial on the basis of newly discovered evidence, the moving party must show that: (1) the evidence itself, and not merely its materiality, is newly discovered; (2) the newly discovered evidence is not merely cumulative; (3) including the new evidence on retrial would probably cause a different result; and (4) the party could not with reasonable diligence have discovered and produced the evidence at trial. *People v. Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003).
>
> Defendant has failed to show that the newly discovered evidence is not merely cumulative and that the new evidence on retrial would probably cause a different result. The incident report and victim's statement attached to defendant's new trial motion are cumulative because trial counsel elicited testimony that the victim told his grandparents, aunt and cousins that no sexual abuse occurred. Thus, the jury had evidence that the victim previously recanted the allegations of sexual abuse. In addition, defendant has not established that the incident report and statement would probably cause a different result on retrial because similar evidence was placed before the jury at trial.

(MCOA at 3; docket #39.)

In her third ground for habeas corpus relief, Petitioner argues a newly discovered

evidence claim based upon Ronny's perjured testimony.  Ronny allegedly admitted to Dr. Stephen

Miller and passed a polygraph examination that he perjured his testimony.  (Am. Pet. at 9, docket

#6.)  Petitioner presented this claim in a motion for a new trial filed on or about February 7, 2005.

---

[5]In support of Petitioner's amended application for habeas corpus relief, Petitioner submitted several Rule 5 documents.  (*See* dockets #7-11.)  Petitioner, however, failed to attach certain exhibits to her Rule 5 material.  Therefore, the Court shall cite to the Rule 5 material submitted by the Attorney General for clarity when Petitioner's supporting documents are not complete.  (*See* dockets #39-40.)

On February 14, 2005, the trial court held oral arguments on the motion for a new trial.  (Mot. for

New Trial Tr., Feb. 14, 2005, docket #38.)  In denying Petitioner's motion for a new trial, the

Calhoun County Circuit Court provided the following:

> Well the Court rules on two bases; first of all I will find, for the record, that the
> Prosecutor's written response, filed the eighth, objecting to the motion on the basis
> that it has been - previously been heard is well taken.  But - and that in itself is, so
> far as I'm concerned, more than adequate grounds to deny the motion.
>
> Beyond that though, going to the substance of the motion, I am not satisfied it sets
> out an adequate basis for any relief, including an evidentiary hearing in that first of
> all it raises nothing new in the way of evidence that is likely to be admissible at trial,
> or that would, even assuming it were to be accepted as the basis for a new trial, likely
> cause a different result.  The credibility of the complainant in this case, the
> youngster, was fully - fully before the jury, including evidence that he had - first was
> hesitant to testify, second that he had, even at that time, said on at least one occasion
> that his statements implicating the Defendant, were not true.
>
> There is nothing raised in this new motion, other than an additional basis for that
> assertion, which I'm not convinced has any more weight than it did during the trial
> apparently to the fact finder.  There's nothing new raised that meets the requisite
> foundation for the granting of relief under the motion, so it is denied.

(Mot. for New Trial Tr., Feb. 14, 2005, 11-12, docket #38.)  On February 28, 2005, the Calhoun

County Circuit Court denied Petitioner's motion for a new trial.  (Calhoun County Circuit Court

Order, Feb. 28, 2005, docket #9.)  Petitioner appealed the denial of her motion for new trial to the

Michigan Court of Appeals.  The Michigan Court of Appeals construed Petitioner's motion for a

new trial as a successive motion for relief from judgment under MICH. CT. R. 6.502(G)(1).  (Mich.

Ct. App. Order, May 20, 2005, docket #40.)  After dismissing Petitioner's delayed application for

lack of jurisdiction, the Michigan Court of Appeals stated:  "[a]s noted by both the prosecutor and

the trial court what was submitted would not satisfy the four conditions required for newly

discovered evidence."  (*Id.*)

- 29 -

In Petitioner's fourth ground of habeas corpus relief, she argues that a prosecutorial witness, who was a state prisoner, had a history of contacting various prosecutors for favorable treatment and made up the story that Petitioner had confessed to sexually assaulting Ronny. Petitioner presented this claim to the Calhoun County Circuit Court as a motion for relief from judgment on September 1, 2004. The trial court denied the motion as follows:

> This Court finds that none of the grounds raised in the Motion possess sufficient merit to justify relief and further finds that none of the evidence alleged to be newly discovered, even assuming that all the foundational elements are satisfied that it is newly discovered evidence, would result in a different verdict, assuming that a new trial was granted and that the claimed newly discovered evidence is, in fact, admissible at such a trial.

(Calhoun County Circuit Court Order, Sept. 15, 2004, docket #8.)

To the extent Petitioner claims that she is entitled to a new trial under Michigan law, she presents a state-law claim that is not cognizable for purposes of habeas corpus review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Petitioner's claim of actual innocence also fails to state a cognizable federal claim. In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), the Supreme Court stated: "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." But the *Herrera* Court did not close the door completely, stating in dicta: "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. Thus, even without the occurrence of any independent constitutional violation during the state criminal proceeding, federal habeas relief might be warranted for "truly persuasive demonstration of actual innocence," provided: (1) the habeas petition seeks relief in a capital case, in which case such a

- 30 -

demonstration of actual innocence "would render the execution of a defendant unconstitutional"; and (2) there is "no state avenue open to process such a claim." *Id.* The Supreme Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House v. Bell*, 547 U.S. 518, 555 (2006) ("In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'"); *Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007).

Two years after *Herrera*, the Supreme Court held that a claim of actual innocence can be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 315 (citing *Herrera*, 506 U.S. at 404). Thus, the Supreme Court distinguished between a procedural innocence claim, which can permit a petitioner to overcome procedural obstacles that would otherwise preclude review of underlying constitutional claims, and the substantive or "free- standing" claim of innocence discussed in *Herrera*.

This Court may grant habeas corpus relief only when the state court has violated or unreasonably applied a clearly established holding of the Supreme Court. *See* 28 U.S.C. § 2254(d);

- 31 -

*Williams*, 529 U.S. at 412.   In the absence of clearly established Supreme Court precedent establishing a free-standing claim of actual innocence, Petitioner's claims are without merit.   The Sixth Circuit repeatedly has held that free-standing claims of actual innocence are not cognizable on habeas corpus review. *See Cress*, 484 F.3d at 854 (citing cases).   Even if Petitioner could invoke this exception and obtain habeas relief on her freestanding innocence claims, she would have to meet both of the requirements set forth above and then overcome the "extraordinarily high" threshold. *See Herrera*, 506 U.S. at 417; *see also House*, 547 U.S. at 555; *Cress*, 484 F.3d at 854-55. Petitioner fails the first requirement. This is not a capital case, and, thus, the concern about the unconstitutionality of executing a defendant who has shown persuasive evidence of actual innocence is not implicated. *See Herrera*, 506 U.S. at 417 ("We first point out the obvious - that this is not, in fact, a capital case.").   Petitioner, therefore, cannot obtain habeas corpus relief on her freestanding claims of actual innocence.

B.      **Ineffective Assistance of Trial Counsel:  Ground I**

In her first ground of habeas corpus relief, Petitioner alleges that her trial counsel violated her Sixth Amendment right to the effective assistance of counsel because counsel failed to (1) timely file a witness list, (2) call Petitioner's expert witness at trial, (3) object to the admission of prejudicial evidence, and (4) properly prepare for trial.  Petitioner's claims are both procedurally defaulted and without merit.

1.      Procedural Default

All of Petitioner's claims of ineffective assistance of trial counsel are procedurally defaulted.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted her federal claim in state court, the petitioner must demonstrate either (1) cause for her failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in her claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House*, 547 U.S. at 536; *Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup*, 513 U.S. at 327).

In her direct appeal before the Michigan Court of Appeals, Petitioner raised the following four claims of ineffective assistance of counsel:  (1) counsel failed to timely file a witness list, (2) counsel failed to call Petitioner's expert witness at trial, (3) counsel failed to object to the admission of prejudicial evidence, and (4) counsel failed to present available testimony and evidence.  (*See* Def.-Appellant's Am. Br. on Appeal, docket #39.)  Petitioner, however, did not present those claims to the Michigan Supreme Court.

In her motion for relief from judgment filed September 1, 2004, Petitioner argued that she was also denied the effective assistance of trial counsel due to counsel's failure to properly investigate and interview potential witnesses.  (*See* Def.'s Br. in Supp. of Mot. for Relief from J.,14, docket #8.)  The Calhoun County Circuit Court subsequently denied Petitioner's motion for relief from judgment.  (*See* Calhoun County Circuit Court Order, Sept. 15, 2004, docket #8.)  Petitioner did not appeal the trial court's denial of her motion for relief from judgment to the Michigan Court of Appeals or Michigan Supreme Court.

Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.  *Duncan*, 513 U.S. at 365-66; *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993); *Hafley v. Sowders*, 902 F.2d

480, 483 (6th Cir. 1990). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. A petitioner has fairly presented his claims when he identifies the constitutional right that he claims has been violated and the particular facts which supported his claims to the state courts. *Onifer v. Tyxzkiewicz*, 255 F.3d 313, 315 (6th Cir. 2001).

Exhaustion is a problem, however, only if there is a state-court remedy available for petitioner to pursue, thus providing the state courts with an opportunity to cure any constitutional infirmities in the state-court conviction. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Under Michigan law, a prisoner may only file one motion for relief from judgment. *See* MICH. CT. R. 6.502(G)(1). Petitioner filed her one allotted motion for relief from judgment; therefore, she has no available remedy in the state court. Because no further state remedy is available to Petitioner, her claims are procedurally defaulted. *Rust*, 17 F.3d at 160.

Review of Petitioner's claim is barred unless she can show cause and prejudice or that a lack of federal habeas review will result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536*; Murray*, 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52. Petitioner argues that she should be entitled to habeas review notwithstanding her procedural default because she is actually innocent of the offense. She asserts that her conviction has resulted in a fundamental miscarriage of justice. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536-37.

In determining whether an applicant has met the requirements for establishing a cognizable claim of actual innocence in order to obtain review of a procedurally defaulted claim,

the court must apply the actual-innocence standard developed in *Schlup*. *See Souter v. Jones*, 395 F.3d 577, 596 (6th Cir. 2005). Under *Schlup*, the petitioner "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327 ("[T]he standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."); *see also Souter*, 395 F.3d at 602. "[T]o be credible a gateway claim requires new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *House*, 547 U.S. at 537 (internal quotation marks omitted). The Court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* (internal quotation marks omitted). "[T]he *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327) (internal quotation omitted).

In light of the evidence, I find that Petitioner failed to establish that it is more likely than not that no reasonable juror would have found her guilty beyond a reasonable doubt. As discussed above, Ronny testified several times that Petitioner sexually abused him by performing oral sex on his "wiggly." When asked whether something happened between Petitioner and his private part, which Ronny referred to as his "wiggly," Ronny first answered "I do not remember." (Tr. III, 160-61.) Ronny later recanted and stated that he did not want to say it out loud. (Tr. III, 167.) On school mornings, Cody would watch for the bus outside while Petitioner dressed Ronny

- 36 -

on the living room floor.  (Tr. III, 159-60, 178.)  Before the bus arrived, Ronny testified that Petitioner would "put her mouth on [his] wiggly."  (Tr. III, 167.)  This occurred every school morning. (Tr. III, 167-68.)  Ronny also testified that he felt something wet on his wiggly when he slept in the same bed as Petitioner at his grandparents' house, commonly known as the farm. "Pretty much all week," Ronny would feel something wet, like spit, on his wiggly. (Tr. III, 171-73.) Ronny was not dreaming at the time he could feel those things happening to him.  (Tr. III, 204-05.)  On those occasions, Petitioner was the only person in bed with Ronny.  (Tr. III, 172.)

Ronny told several individuals that the allegations were not true because he was nervous or did not want to discuss it.  Ronny initially told the police, prosecutor and Child Protective Services that nothing happened because he was nervous.  (Tr. III, 186-87.)  The second time Ronny met with the police, prosecutor and Child Protective Services, he admitted that Petitioner had oral sex with him on numerous occasions. (Tr. III, 187, 189.)  Ronny explained that Petitioner performed oral sex on him while she changed his clothes in the living room.  (Tr. III, 197-98.)  Ronny reiterated that he was not saying those things about Petitioner to avoid being in trouble for engaging in sexual contact with his cousin.  (Tr. III, 189, 192.)  Ronny also told his grandparents that it was not true because he did not want to talk about it.  (Tr. III, 181, 185.)

Dr. Randall Haugen, a psychologist, testified as an expert in the area of child sexual abuse and offenders.  (Tr. IV, 16, 18.)  He found that it is not uncommon in abused children to become sexually reactive, such as engaging in sexual behavior with another child.  (Tr. IV, 23-24.) Dr. Haugen concluded that Ronny has manifested behaviors of some children who have been sexually abused.  (Tr. IV, 29.)  Ronny demonstrated sexually-reactive behavior towards other

children, compulsive masturbation, nightmares, disturbing dreams and he hoarded women's underwear.  (Tr. IV, 29.)

During Petitioner's interview, Detective Guy Picketts told Petitioner that Ronal and Linda Swain entered a complaint against her concerning criminal sexual conduct.  (Tr. V, 46-47.)  When Detective Picketts explained that the complaint concerned oral sex with Ronny, Petitioner went from being relatively calm to extremely vocal and animated.  (Tr. V, 47.)  Petitioner blurted "I never sucked my kid's dick" before Detective Picketts finished his statement.  (Tr. V, 47, 54.)  Detective Picketts was surprised by Petitioner's outburst because he never indicated, other than using the words "oral sex," that Petitioner had performed oral sex on her son.  (Tr. V, 47-48, 54.)

In 2001, Deborah Charles met Petitioner in the prison yard at the Robert Scott Correctional Facility.  (Tr. V, 68, 73.)  At their first encounter, Petitioner denied "suck[ing] [her] son's dick" and called the "little bastard" a liar.  (Tr. V, 71-72.)  In a later meeting, Petitioner confided that she may have slept naked with Ronny once to Ms. Charles.  (Tr. V, 75-76.)  Petitioner then proceeded to tell Ms. Charles that she had oral sex with Ronny because she was on crack at times and did not know what she was doing.  (Tr. V, 76.)

Petitioner has failed to present evidence sufficient to establish that this Court's refusal to hear the defaulted claims would be a "miscarriage of justice."  *Schlup*, 513 U.S. at 326.  While Petitioner cannot meet the high threshold for a reliable claim of actual innocence, the Court will consider whether she has shown "cause and prejudice" for her defaulted claims.  Petitioner raised claims of ineffective assistance of counsel in her amended application for habeas corpus relief.  Ineffective assistance of counsel may constitute "cause" for Petitioner's failure to raise her claims

on direct appeal.  To serve as cause to excuse the default, a claim of ineffective assistance of counsel must itself be properly exhausted.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell*, 274 F.3d at 349; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).  Petitioner raised claims of ineffective assistance of counsel on direct appeal and in her motion for relief from judgment.  However, she did not raise those claims through all levels of appellate review; thus, the claims are unexhausted.  Petitioner therefore has failed to demonstrate cause excusing her default.  Where a petitioner fails to show cause, the court need not consider whether she has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

### 2.    Merits

Even were she able to demonstrate cause and prejudice excusing her procedural default, Petitioner would not be entitled to relief on the merits of her claims of ineffective assistance of counsel.  Petitioner alleges that her trial counsel violated her Sixth Amendment right to the effective assistance of counsel because counsel failed to (1) timely file a witness list, (2) call Petitioner's expert witness at trial, (3) object to the admission of prejudicial evidence, and (4) properly prepare for trial.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance of counsel must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the

- 39 -

challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the unreasonable application prong of § 2254(d)(1). Under the "unreasonable application" standard, the state court identifies the correct governing legal rule from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Wiggins v. Smith,* 539 U.S. 510, 520 (2003); *Williams,* 529 U.S. at 412-13; *Barnes v. Elo,* 339 F.3d 496, 501 (6th Cir. 2003). The Michigan Court of Appeals applied the *Strickland* standard and exhaustively addressed the specific claims of attorney error raised in the state court.

### a.    **Witness List**

Petitioner first argues that counsel's failure to file a timely witness list constituted ineffective assistance of counsel. In rejecting Petitioner's claim on appeal, the Michigan Court of Appeals stated:

> Defendant has failed to establish that trial counsel's failure to respond to the prosecutor's initial demand to produce a list of expert and lay witnesses before August 2, 2002, constituted objectively unreasonable representation. Testimony presented at the *Ginther* hearing established that trial counsel filed a witness list naming Miller at least seven days before trial and furnished the prosecutor with that list. Thus, the prosecutor was apprised that defense counsel might call the witness. Further, defendant presents no evidence establishing that defendant's representation was adversely affected by trial counsel's decision to wait until August 2, 2002, to file

that witness list. Defense counsel's testimony indicates that his reason for not calling Miller had nothing to do with the timing of the filing of his witness list. Accordingly, there is no indication that his delay in filing his witness list amounted to objectively unreasonable representation or that it affected the outcome of trial in any way.

(MCOA at 1, docket #39) (footnote omitted).

The Michigan Court of Appeals' conclusion was not an unreasonable application of established Supreme Court precedent.   Under *Strickland*, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citing *Michel*, 350 U.S. at 101); *see also Groseclose v. Bell*, 130 F.3d 1161, 1167 (6th Cir. 1997).   A court reviewing counsel's performance "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Id.* at 690-91; *see also Groseclose*, 130 F.3d at 1167-68.

Petitioner cannot overcome the presumption that counsel's decision was the result of trial strategy.  In February 2002, the prosecutor demanded a list of lay and expert witnesses from Petitioner's trial counsel, Edwin Hettinger. (Ginther Hearing Tr. (Ginther Tr. I), vol. I, June 4, 2003, 12, 25, docket #34.) At that time, Mr. Hettinger did not know all of the defense witnesses. (Ginther Tr. I, 25.) On August 2, 2002, Mr. Hettinger filed two witness lists. (Ginther Tr. I, 9, 13-14.)  The trial started August 13, 3002.  (Ginther Tr. I, 9-10.)  Mr. Hettinger thought he would not be sanctioned if his witness lists were filed within seven days of the trial date.  (Ginther Tr. I, 22-23.) He did not file a witness list sooner because he was not sure of which witnesses he would call. (Ginther Tr. I, 25.)  Notably, the trial court never prevented Mr. Hettinger from calling any of the witnesses.  (Ginther Tr. I, 81, 83-84.)  The trial court, however, ruled that Petitioner's expert

witness, Dr. Stephen Miller, could not testify if he was going to listen to the testimony of the other witnesses in the courtroom.  (Ginther Tr. I, 30, 85.)

As counsel's decision to wait to file the witness lists did not effect his ability to call any witnesses, I conclude that trial counsel's conduct fell within the range of reasonable professional assistance.  Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice.  *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004)  ("When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'") (quoting *Strickland*, 466 U.S. at 697).   The Court, therefore, need not consider whether Petitioner was prejudiced by counsel's conduct.

b.      **Expert Witness**

Petitioner argues that trial counsel's failure to call Dr. Stephen Miller to testify as an expert witness violated her Sixth Amendment right to the effective assistance of counsel.  The Michigan Court of Appeals rejected Petitioner's argument as follows:

> Likewise there is no indication that defense counsel's failure to call Miller to testify at trial was objectively unreasonable representation. Trial counsel testified that his decision not to call Miller to the stand was based on trial strategy after the court issued the sequestration order. Because this Court will not substitute its judgment for that of counsel regarding matters of trial strategy, *People v Rice (On Remand)*, 235 Mich App 429, 445; 597 NW2d 843 (1999), and because decisions as to whether to call witnesses are presumed to be matters of trial strategy, *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999), defendant has failed to establish that defense counsel's failure to call Miller rose to the level of ineffective assistance.

(MCOA at 2, docket #39.)

The Michigan Court of Appeals' conclusion was not an unreasonable application of *Strickland*.  As thoroughly explained at the *Ginther* hearing, defense counsel articulated a strategic

reason for not calling Dr. Miller to testify.  After the court issued a witness sequestration order, Mr. Hettinger and Dr. Miller discussed whether Dr. Miller should testify or assist with the cross-examination of prosecutorial witnesses.  (Ginther Tr. I, 30, 85.)  Ultimately, Dr. Miller thought he should remain in the courtroom to listen to testimony rather than testify.  (Ginther Tr. I, 85; Ginther Hearing Tr. (Ginther Tr. II), vol. II, June 4, 2003, 10-11, docket #35;  Ginther Tr. ("Ginther Tr. IV"), vol. II, June 19, 2003, 8-9, docket #37.)  Mr. Hettinger therefore decided not to call Dr. Miller as a witness.  (Ginther Tr. I, 26, 28-30, 35.)  Mr. Hettinger used Dr. Miller's pre-trial and cross-examination notes to develop his defense theories with several witnesses.  (Ginther Tr. I, 35-36, 59-60, 67, 70-72; Ginther Tr. (Ginther Tr. III), vol. I, June 19, 2003, 29-38, docket #36.)  Dr. Miller also thought he could testify as a rebuttal witness.  (Ginther Tr. III, 21-22.)  Because no one discussed the sexual abuse syndrome during trial, however, Mr. Hettinger could not offer Dr. Miller's rebuttal testimony.  (Ginther Tr. III, 38-39.)

In light of the record, Petitioner cannot overcome the presumption that the challenged action could be considered sound trial strategy.  Mr. Hettinger and Dr. Miller both determined that it was best for Dr. Miller to help with Mr. Hettinger's cross-examination of prosecutorial witnesses.  (Ginther Tr. I, 30, 85; Ginther Tr. II, 10-11;Ginther Tr. IV, 8-9.)  Accordingly, Petitioner fails to meet the first requirement of *Strickland*.  Because the Court need not address both components of the inquiry if the defendant makes an insufficient showing on one, this Court will not address whether Petitioner was prejudiced by counsel's conduct.   *See Campbell*, 364 F.3d at 730.

c.       **Failure to Object**

Petitioner argues that trial counsel's failure to object to the admission of prejudicial evidence against her violated her Sixth Amendment right to the effective assistance of trial counsel. Specifically, Petitioner argues that her trial counsel should have objected to testimony regarding (1) threats by Petitioner; (2) violations of court orders by Petitioner; (3) her crack cocaine addiction; (4) her credibility; (5) a reference to her as a sexual predator; (6) the investigation of Petitioner by Child Protective Services; (7) hearsay statements; (8) the personal opinion of Dr. Randall Haugen, an expert in child sexual abuse and offenders; (9) her prostitution; and (10) Petitioner's marijuana and alcohol use.  The Michigan Court of Appeals ruled on those issues as follows:

> Defendant next argues that nine instances where trial counsel failed to object to allegedly improper evidence introduced at trial deprived her of her right to effective assistance.  Because defendant failed to demonstrate how trial counsel's failures likely affected the outcome of trial, she has failed to establish a claim of ineffective assistance.

> Defendant next argues that trial counsel's questioning of a prosecution expert witness regarding his opinion as to whether the victim was abused and trial counsel's failure to object to an expert witness' testimony that the victim manifested behavior consistent with some children who have been sexually abused deprived her of effective assistance of counsel. We disagree.

> The expert never expressed an opinion regarding defendant's guilt or innocence, or an opinion regarding the credibility of the victim's testimony. On direct-examination, the expert explained certain behaviors that sexually abused children typically manifest.  Then he compared the victim's behaviors with those common symptoms of sexually abused children and determined that the behaviors and symptoms were "consistent."  He never testified that defendant abused the victim, or that the victim was credible.  On the contrary, he testified that he could not state whether abuse occurred and that his role, as a psychologist, is not to determine guilt or innocence. He then explained how the law prohibited him from expressing his opinion as to whether criminal sexual conduct occurred.  Because we conclude that defendant's argument is based on a misrepresentation of trial testimony, we further conclude that defendant failed to establish a claim of ineffective assistance.

\*\*\*

- 44 -

Defendant next argues that trial counsel deprived her of her right to the effective assistance of counsel by failing to object to, or opening the door to, the admissibility of prejudicial evidence regarding defendant's crack cocaine addiction, her prostitution, her violation of court orders, her threats, and her marijuana and alcohol use. Defendant has abandoned this issue because her two-sentence argument does not properly address the merits of her assertion of error. *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002).

(MCOA at 2-3, docket #39.)

The Michigan Court of Appeals' decision was not an unreasonable application of *Strickland*. "[T]rial counsel's tactical decisions are particularly difficult to attack," *O'Hara v. Wigginton,* 24 F3d 823, 828 (6th Cir. 1994), and a petitioner's challenge to such decisions must overcome a presumption that the challenged action might be considered sound trial strategy, *Darden v. Wainwright,* 477 U.S. 168, 185-87 (1986). Petitioner failed to overcome the presumption of trial strategy.

At the *Ginther* hearing, Mr. Hettinger stated that he attempted to portray Petitioner as a good mother despite the fact that Petitioner used drugs, violated court orders and engaged in prostitution. (Ginther Tr. I, 41-43.) He felt that the jury needed to hear the truth about Petitioner so he opened the door to character evidence on direct examination. (Ginther Tr. I, 43-45.) Therefore, Petitioner admitted that she smoked marijuana (Tr. VI, 19-20; Tr. VII, 31), used cocaine (Tr. VI, 19, 21; Tr. VII, 27, 32), violated court orders by moving to Kentucky (Tr. VI, 37-38; Tr. VII, 41-42), and acted as a prostitute (Tr. VII, 8). Mr. Hettinger also stated that it is trial strategy not to object to some line of questioning by the prosecutor. (Ginther Tr. II, 6.) He would not object to testimony that is already into evidence. (Ginther Tr. II, 6.) Several witnesses testified as to Petitioner's drug use. (Tr. V, 76 (Deborah Charles); Tr. V, 136-37 (George Johnson); Tr. V, 158, 160 (Steven Way).) He would

also not object to certain testimony in order to avoid the appearance that he was hiding something from the jury.  (Ginther Tr. II, 6.)

        The court must not indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690.  Counsel made a strategic decision to allow Petitioner to testify regarding her character because he wanted to portray her as a good mother despite her problems.  Counsel also decided not to object to certain testimony in order to be up-front with the jury.  Therefore, Petitioner failed to satisfy the first prong of the *Strickland* test as to testimony regarding (1) threats by Petitioner; (2) violations of court orders by Petitioner; (3) Petitioner's crack cocaine addiction; (4) Petitioner's credibility; (5) a reference to Petitioner as a sexual predator; (6) the investigation of Petitioner by Child Protective Services; (7) hearsay statements; (8) Petitioner's prostitution; and (9) Petitioner's marijuana and alcohol use.  *See Strickland*, 466 U.S. at 690.  As Petitioner failed to satisfy the first prong of the *Strickland* standard, the Court need not address the second prong.  *See Campbell*, 364 F.3d at 730.

        Petitioner also asserts an ineffective assistance of counsel claim regarding the testimony of the prosecution's expert witness, Dr. Randall Haugen.  As the Michigan Court of Appeals noted, Petitioner's interpretation of Dr. Haugen's testimony is misplaced.  The prosecutor questioned Dr. Haugen as to whether Ronny's behavior was consistent with a child who had been sexually abused.  (Tr. IV, 29.)  Dr. Haugen replied that Ronny had manifested behaviors of some children who had been sexually abused.  (Tr. IV, 29.) Petitioner argues that her trial counsel, Mr. Hettinger, failed to object to the prosecutor's question.  She also argues that Mr. Hettinger

inappropriately attempted to obtain Dr. Haugen's personal opinion as to whether any sexual abuse

occurred between Petitioner and Ronny.

Mr. Hettinger questioned Dr. Haugen on cross-examination as follows:

Q     You're not able to state that factors that may be consistent with child abuse
      mean that Ronald was abused, correct?

A     That is correct.

Q     You're not able to state that based on your exposure to him that [] child abuse
      occurred, correct?

A     Correct.

                                        ***

Q     So you're not able to say, for a fact, that any of his behaviors reflect that
sexual  abuse actually occurred.

A     Yeah.  That's not my role.  My role, as a psychologist, is not to determine guilt
      or innocence.

(Trial Tr. V, 4-5.)  On re-direct examination, the prosecutor questioned Dr. Haugen as follows:

Q     Mr. Hettinger asked you if you could give your personal opinion as to whether
      or not the abuse occurred.  You're aware that the law actually prohibits you
      from doing that.  Is that –

A     That's correct.

Q     So all you are permitted to say is whether or not behavior is consistent with
an    abuse.  Is that correct?

A     That is correct.

Q     So if you had a personal opinion, you would not be allowed to give that.

A     That is correct.

(Trial Tr. V, 7.)

Dr. Haugen testified that he could not express an opinion regarding Petitioner's guilt or innocence, or an opinion regarding the credibility of Ronny's testimony. (Trial Tr. V, 5, 7.) He explained that the law prohibited him from expressing his opinion as to whether criminal sexual conduct actually occurred. (Trial Tr. V, 7.) The Michigan Court of Appeals concluded that Petitioner's argument was based on a misrepresentation of trial testimony, and therefore failed to establish a claim of ineffective assistance of counsel. This Court agrees with the reasoning of the Michigan Court of Appeals' decision. It is clear from the record that Petitioner's counsel provided the effective assistance of counsel. Any objection to Dr. Haugen's testimony would have been futile. Defense counsel cannot be deemed deficient for failing to make a futile objection. *See United States v. Sanders,* 404 F.3d 980, 986 (6th Cir. 2005) (counsel cannot be ineffective for failing to object to what was properly done); *Harris v. United States,* 204 F.3d 681, 683 (6th Cir. 2000) (failure by counsel to do something that would have been futile is not ineffective assistance); *United States v. Hanley,* 906 F.2d 1116, 1121 (6th Cir. 1990) (counsel not ineffective for failing to pursue motions that would have been futile); *Clark v. Collins,* 19 F.3d 959, 966 (5th Cir.1994) ("[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Therefore, the Michigan Court of Appeals' decision was not an unreasonable application of *Strickland.*

### d.      **Preparation for Trial**

Finally, Petitioner argues that her trial counsel was ineffective because he did not adequately prepare for trial by presenting video tape evidence of the victim[6] and by investigating and

---

[6]Petitioner presented her claim regarding the video tape evidence in her direct appeal to the Michigan Court of Appeals.

interviewing potential witnesses[7].   It is well-established that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'"  *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690).  This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691.  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *accord Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004).  A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them."  *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) (citing *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)).

---

[7]Petitioner submitted the claim for failure to investigate and interview witnesses in her Motion for Relief from Judgment to the Calhoun County Circuit Court.  Petitioner attached her Motion for Relief from Judgment to her amended application for habeas corpus relief.  The Motion provides:

> 14.  In the present case, Defense counsel failed not only to investigate the issue of self-defense but failed to call potential self-defense witnesses.

> 15.  The failure to investigate Defendant's defense prior to trial, i.e. to try to contact these res gestae witnesses in a reasonable manner, and the resulting failure to call them at trial constituted ineffective assistance of counsel. There is no sign his failure to present these witnesses was a sound strategic decision, or any kind of strategic decision. It was a decision made in the blind. Their testimony would have provided a substantial defense.

(Mot. for Relief from J. at 18; docket #8.)  Petitioner's arguments do not appear to be relevant in the present case.  Self-defense is not an appropriate defense to a charge of criminal sexual conduct.  It would have been frivolous for Petitioner's counsel to raise this argument.  Accordingly, counsel was not deficient under *Strickland* for failing to do so.

First, Petitioner argues that trial counsel should have introduced a video tape recording of the victim.  The Michigan Court of Appeals dismissed this claim as follows:

> Defendant argues that an evidentiary hearing pursuant to *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973), is necessary to establish that trial counsel's failure to present a videotape of the victim denying that defendant abused him deprived her of effective assistance.  Because defendant received a *Ginther* hearing on this issue, we find no merit to this argument. At that hearing, trial counsel testified that the reason he did not introduce the videotape into evidence was because it was inadmissible hearsay and because he already elicited the victim's sworn testimony that the victim told his grandparents the sexual abuse never occurred.  Because defendant has failed to establish how defense counsel's failure to present inadmissible evidence constituted objective unreasonable representation or how the failure to introduce the inadmissible videotape likely affected the outcome of trial, we find no merit to defendant's argument.

(MCOA at 3, docket #39.)

At the *Ginther* hearing, Mr. Hettinger stated that he thought Ronny would come clean during the trial.  (Ginther Tr. II, 8-10.)  Mr. Hettinger had a video tape of Ronny stating that the allegations were false.  (Ginther Tr. I, 88-89; Ginther Tr. II, 8-10.)  Mr. Hettinger, however, did not introduce the video tape into evidence because it was inadmissible hearsay and he had already elicited the victim's sworn testimony that he told his grandparents the sexual abuse never occurred.  (Ginther Tr. I, 88-89.)  As the Michigan Court of Appeals noted, the video tape evidence was inadmissible hearsay.  Counsel is not obliged to move for evidence to be admitted when such motion would be futile.  *See Harris*, 204 F.3d at 683; *Hanley*, 906 F.2d at 1121.  Accordingly, I conclude that the state appellate court's decision on the video tape evidence was not an unreasonable application of *Strickland*.

Petitioner's claim regarding counsel's failure to investigate and interview potential witnesses also fails.  At the *Ginther* hearing, Mr. Hettinger testified that he was not prepared to go to trial when Mr. Hettinger received the trial date notice on July 18, 2002.  (Ginther Tr. I, 30-31.)

He was surprised that the trial would begin on August 13, 2002, but he felt that he had sufficient time to prepare.  (Ginther Tr. I, 88.)  Mr. Hettinger mainly focused on Petitioner's case from July 18 to August 13.  (Ginther Tr. I, 87-88.)  After Mr. Hettinger received the trial notice, he prepared witness lists and interviewed all of the witnesses, including Petitioner.  (Ginther Tr. I, 31-32.)  Mr. Hettinger also requested Petitioner to be moved to the county jail early in preparation for her trial.  (Ginther Tr. I, 33, 88.)  He hired a private investigator, Al Morris, to interview the incarcerated witnesses. (Ginther Tr. I, 90-91.)  Prior to the trial, Mr. Hettinger filed motions for discovery, including a request to review privileged information between Ronny and his therapists.  (Ginther Tr. I, 79-80.) On August 13, Mr. Hettinger felt prepared for trial.  (Ginther Tr. I, 34, 88.)

Petitioner's trial counsel, an experienced criminal lawyer, received notice of the trial on July 18, 2002, twenty-six days before the trial began on August 13.  (Ginther Tr. I, 4, 30-31, 46, 88.)  Furthermore, Petitioner's case involved a relatively uncomplicated criminal charge, which was tried in four days.  *Compare Hunt v. Mitchell*, 261 F.3d 575 (6th Cir. 2001) (Petitioner denied the effective assistance of counsel when counsel was appointed on the day of trial and the court refused to grant counsel ten minutes to consult with petitioner before proceeding to voir dire).  Therefore, the decision of the trial court was not an unreasonable application of *Strickland*.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the amended habeas corpus petition (docket #6) be denied.

Date:  August 20, 2008                                /s/ Ellen S. Carmody
                                                      ELLEN S. CARMODY
                                                      United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).